of America, AFL-CIO Local 13,000, case number 20-1908. Ms. Lassen, do you wish to reserve any time for rebuttal? I do, Your Honor. Three minutes, please. That's fine. Thank you. You may proceed. Thank you, Your Honor. Good afternoon. Please support me, I'm Nan Lassen on behalf of Communications Workers of America. As we know, a labor arbitration award is entitled to a presumption of validity. That presumption is not overcome in this case because the board's award is not in manifest disregard of Article 17.01 of the collective bargaining agreement or outside the board's authority. That's the test that this court set forth in Brentwood Medical Associates. In this case, the board clearly had the authority to issue the remedy award and it had that authority because the parties gave it. While Verizon now contends that the board lacked authority, that's completely at odds with the conduct of the parties in this case. The record here reflects that CWA and Verizon mutually agreed that the board should decide the remedy issues contained in this award. Until it didn't prevail, Verizon never objected to the board lacking authority. I think that's sort of maybe the easy part of the case. Clearly, the arbitrators had the power to enter an award, at least it's clear in my mind. The question is what type of findings needed to be made and what type of award would be appropriate based on those findings. That's what I'm struggling with. I'm struggling with connecting up the board's, the arbitrator's finding of, quote, no lost income. I think that's a direct quotation, right? No lost income with compensatory damages. I mean, I'm struggling reconciling those two things that appear to be diametrically opposed. Can you help me with that? I would. Thank you, your honor. I'd be glad to do that. The cornerstone of this case and the most pivotal provision in the arbitration awards appears at A247 in the merits award. In this case, considering article 17.01, the board asked the foundational question. The question is whether there was an established policy in effect at the time of the change as to the assignment of the installation and maintenance work and the delivery of the equipment. The board found that the record evidence confirms the union's claim that bargaining unit members were assigned to deliver the set-top boxes that they installed beginning when the service bios was implemented. Another point in the awards, excuse me, are you quoting the remedy decision or the merits decision right now? That's in the merits award, your honor. The board, the arbitration board specifically held that the protective work assignment encompassed the delivery and the installation of set-top boxes when the board had to address the issue in the remedy award of what remedy would flow from this pivotal definition of the work assignment. Because all of the issues in this case emanate from the board's funding that the work assignment protected included both delivery and installation. And it did that work. We're at merits at 253, your honor, your charging. The board says that the services technicians, quote, were denied the opportunity to perform the delivery work in question. So that's what's so vexing about this case. So it's clear that if they didn't drop ship a whole bunch of these units, then the service techs would have had more work to do, right? The service techs would have been delivering and installing all of those set-top boxes that ended up being drop shipped, right? That's correct. So here's what I'm wrestling with. If I'm a service tech and I ended up in a typical week, I think they said they did two of these a day. I was a little surprised. I thought it might have been more like three or four. But let's say they did two a day during this period when they were deprived the opportunity. So they get paid a wage, right? A bargain for wage for the week, right? And they delivered on my hypothetical 10 boxes that week. So what I understand your argument to be is that they need to be compensated because instead of delivering only 10 boxes a week, they should have had the privilege and the opportunity of delivering 50 boxes a week. And I'm scratching my head thinking, aren't they a lot better off only delivering 10 boxes a week for X dollars rather than delivering 50 boxes a week for the very same X dollars? Whether that's the case or not, Judge Hardiman, that's not what this arbitration board found. Article 17.01 of the Collective Bargaining Agreement means. The Collective Bargaining Agreement says that Verizon has to quote, maintain established work assignments. When the board found that- No, I'm with you on that. I'm with you. I don't see any issue of liability. It seems like a slam dunk. They took work away from the service technicians and outsourced it to UPS or FedEx or whoever. I'm with you on that. What I'm struggling with is the damages because how is it a detriment to a service tech to do only 20% of the work under my hypothetical, 10 boxes a week versus 50 boxes a week? That's not a detriment. That's a benefit. That's less labor for the same pay rather than having to drive around under tremendous pressure and tremendous strain delivering vastly higher quantities of set-top boxes. I think I understand your question, Judge Hardiman. In the record, there was extensive testimony by the union's witnesses that the 40 hour base weekly guarantee is just that. It's a 40 hour guarantee. There are extensive, massive provisions in the collective bargaining agreement at Exhibit A for overtime rates. The denial of the work opportunities in this case was essentially as the union argued in the testimony of Mr. Reamer and Mr. Mooney and the remedy hearings. The denial of the work in this case was to deny the services technicians the additional work opportunities that they would have worked and extra hours over and above the 40 hour base guarantee. Again, I'm with you on that because I'm thinking why didn't the arbitrators just award them overtime? I wonder is the answer to that because the company had no obligation to pay the overtime because the company could have done two things if they were delivering all these other boxes. Number one, they could have hired more service techs or they could have just taken longer and provided worse customer service and had the boxes delivered on a whatever, a two-week delay rather than a two-day delay or a five-day delay. Is that why the board didn't give them overtime because the company wasn't required? There were other ways for the company to deliver boxes short of letting these techs work a 60-hour week instead of a 40-hour week? This is the thing about arbitration. The board will do what it will do. It doesn't have to explain why it did what it did. The union argued vigorously for an overtime rate and in the quote law of the shop, which is evidenced by the plethora of arbitration awards that the panels gave to the board, there are plenty of awards where arbitrators said Article 17 was violated, you denied the work opportunities, overtime rate. This particular board did not agree. I understand the description of how the let's talk for a minute about what the district court did. Why do you think the district court was wrong? The district court on the issue of I'm going to assume Judge Prado that you're asking as a follow-up to Judge Hardiman's question on this issue of punitive damages or is that all of the above? You're appealing the district court's approach and with respect to deciding whether the arbitrator was beyond its jurisdiction in going back and adding to its first decision. Obviously, the district court said no, shouldn't have done that. Why do you think the district court was wrong? Well, the district court was clearly in error there because the parties themselves conferred upon the board the authority to make this remedy award. The parties asked the evidence. The parties presented all of the same issues to the board for decision that it's now presenting to the court and it presented in the district court. The issue was whether the so-called remedy opinion subsumed or went way beyond the merit opinion, right? That's what the district court said. It appeared to be beyond its jurisdiction. Or in fact changed some of its findings from the merit decision. And that's the first question really was whether or not the merit decision should have been limited to in which case then the remedy opinion could and should have gone a certain way. But by this notion that what was the merit opinion has suddenly been expanded, that's where the case started off, is it not? And why was the district court wrong? The district court was wrong because this is not a functus officio case. This is a case of the board. I'm very impressed by your Latin. I don't know Latin, but I've been in the law long enough that a few phrases stuck. That's one of them in labor law. This is not a functus officio case. This is a case where the board was simply continuing the jurisdiction, the remedial jurisdiction that the parties had explicitly submitted to them in the issue before the board and then reconveyed to the board by mutual agreement and voluntarily. So you're not really sticking with the idea that this is an obsolete, you know, for Latin scholars only kind of an idea, but you would agree that it's still a valid doctrine. Is that right? I would submit that the doctrine as we briefed has been greatly questioned and undermined in labor cases. As Judge Posner I think articulately has argued, the exceptions to the doctrine in labor cases have literally swallowed it whole. But for purposes of this appeal, considering functus officio against the actions of the district court, it's clear that this particular board was not out of business. This particular board was very much in business because the parties put it in business. The parties went to the board at A484, you'll see Mr. Rossman's letter, to the neutral arbitrator that says, we want to have remedy hearings and here are all the issues we want to present to you. Verizon itself requested a second day of hearings so that it could present its case. It never objected to the board. Let me ask you, of course you're going to have the other argument because it's all about the money. I mean, it seems to me that's not unusual. It's not all about the money to the union, your honor. It's about the work preservation agreement, the 1943 agreement at 17.01 and preserving the work opportunities as Judge Hardiman stated for the bargaining unit members in the union. When the district court found... I read the merits award is covering just deliveries. I read the remedy award is covering deliveries and installation. Now, you may disagree with that, but hypothetically, if the merits award is changed by, instead of covering just delivery, covering both delivery and installation, is that not an improper expansion of what was decided in the merits award? Two issues are implicit in your question, your honor. Number one, functus officio issue. And I do not believe that the board was functus officio. The board had the right to issue that remedy opinion. It was specifically requested by the parties. Did it have the right in the remedy opinion to expand the scope of the work that was covered? The board did not expand the scope of the work that was covered, your honor. I'm not saying whether it did or not. As a matter of law, did it have the right to expand the work that was covered? If the merits award was not a final award, as I have argued on brief and argued here, the board was sitting in its original remedy jurisdiction and issuing that award. There was a two-part issue submitted to the board at A229. Was the contract violated? And if it was violated, what shall the remedy be? The board had every right to reconvene and finish the second part of its award. I'm talking about the first part of the award. The first part of the issue was the award violated. And hypothetically, if you say that in the merits award, the board holds that the collective bargaining agreement was violated by allowing installation by allowing delivery by third parties, and if in the remedy award, the board said that the collective bargaining agreement was violated by allowing both delivery and installation, is that not an improper change to the merits award? In this particular case, it would not be, your honor. But your hypothetical, with all due respect, is fundamentally an error because the board specifically held at A247 in the merits award that the record evidence confirms the union's claim that bargaining unit members were assigned to deliver the set-top boxes that they installed beginning when the service was implemented. So the board specifically held that the protected work assignment, and that is the cornerstone of article 17.01, that the protective work assignment was the protective work assignment of the boxes. When the parties came to the remand discussions that they had to agree on a compensatory remedy, the reason they could not agree on a compensatory remedy is because the, quote, delivery works in issue was the protective work assignment. So the parties mutually agreed to go back to the board and say to the board, hey, what did you mean when you issued your merits award and you held that the protective work assignment encompassed delivery and installation? Did you in fact require in your cease and desist that installation be returned to the union's bargaining unit members and that a compensatory award was made? And we can't ignore the fact that the board itself explained its intent in the remedy award. The board said in the remedy award, the work at issue, the work at issue, your honor, that is the bargaining unit work that services technicians were deprived of when Verizon drop-shipped set-top boxes to customers includes delivery of the boxes unless the customer has obtained one from a customer, from a company facility, an installation of set-top boxes to be installed or swapped out. I submit that that is, unless we're going to use a ginsu knife approach to mince, slice, dice, and cut up, the award of arbitrators in labor cases. You have to allow the board itself, the arbitrator herself, to explain what her intent was in her merits award. That's what these parties asked arbitrators Zausner to do. Tell us what you meant. Tell us exactly what you meant when you said the record confirms the union's claim that bargaining unit members were assigned to deliver the set-top boxes that they installed. And when you found that that was the protected work assignment, exactly what is it that we, Verizon and CWA, have to do to implement your award? That's what was submitted to arbitrators Zausner. That's what she explained in her remedy award at A267 and 268. What I intended was exactly what I said. The protected work assignment includes delivery and installation. And so accordingly, at the request of the parties, she modified the remedy award to provide that the cease and desist would specify the question presented by the has asserted before she provided that the compensatory damages in this matter for lost work opportunities would include installation work. Ms. Lassen, would you, after you get your well-deserved water there, would you turn from the delivery and installation issue to the issue of, quote, existing customers? Because I also see that as a bit of an elusive issue here. Yes, sir. The merits, the remedy, and frankly, the district court's talking about it. And it appears to me that the CWA and Verizon at least agree that existing customers are those that are pre-2007. I'm not sure I understand how that could be. I honestly can only answer this by saying that I believe Verizon has overread and inflated the cease and desist award. I think the panel, the board rather, was quite clear that the, quote, work that the panel has found to be protected by Article 1701, which occurs in Paragraph 1 of the award. And it also defined the work in issue in A268. The panel meant to speak to the work in issue in this matter, not to all kinds of deliveries and including delivery for new customers. My question is, frankly, I have trouble believing that I could ever install any of this stuff. So the idea that an existing customer would install their own material is exciting to me. But here, who are the existing customers who are the focus of either the merits opinion or the merits decision, the remedy, or frankly, the district court's decision and description of existing customers is a little bit tough to kind of get a I do think that the definition of what an existing customer is, is something that Verizon and the union agree on. That's what I thought. An existing customer. It doesn't make sense to me in the context of this case. I'll try to unravel that if I can. These are, as one dear friend, a judge a different court once said, labor law is so inscrutable. The existing customers in this case were customers who already had a file service. Customers who were seeking, like yourself or another customer, they were seeking to upgrade or swap out or exchange or replace a Fedcom box. Those were existing customers. New customers were not in dispute in this case because it was undisputed that new customers' Fedcom boxes are delivered by services technicians because they come and install the new service. So what's the goal of 2007 in this concept of existing customers? Why is the reference made the year 2007? The Fios went online, Your Honor, in approximately 2006. And in the period from 2006 until the end of 2007 or beginning of 2008, Verizon operated under the established work practice that was found by the board, meaning services technicians carried Fedcom boxes to customer homes that they then installed and brought the spent box back. That's the only place that 2007, to my recollection, comes out. Okay. Why is there not a conflict between the merit opinion and the remedy opinion? If the remedy opinion awards damages for all deliveries, not just to the customers seeking upgrade, why isn't that a conflict? I think it's clear, Your Honor, from the award when the panel said that it was addressing, quote, the work, the work, the ceasing disorder specifically said that it addressed the work that the panel has found to be protected by Article 17.01. So in any order and in any award, I suppose you could always construe it to encompass matters outside the dispute before the board. But in this particular case, the union submits that it was clear from the wording of the arbitrator, perhaps it could have been clearer, perhaps they should have said, and this does not include any other work, not any other deliveries that were not before the arbitration board. But I think it's fair to, fair to assume and to apply an order like this, to apply to the work that was before the board, the work of existing customers. Okay. So when the board... I don't want that to be a dog with a bone on it, but the merit opinion says applying to existing customers, but the remedy opinion does not. Your Honor, again, the case law in this circuit is very clear that arbitrators tangle their words. They don't always express themselves as logically or as clearly or as succinctly or as precisely as I'm sure Your Honor would in her orders in the district court. I don't have any points for that one, but okay. I take your point on that, Ms. Lassen. The point is that that this court shouldn't review ARB awards with the same kind of exacting scrutiny that we review district court orders. And the reason for that is because labor law teaches that we are to give a wide berth as long as, you know, as long as the arbitration panel sort of keeps it, you know, this isn't a matter of exacting scrutiny. They've got a lot of latitude to sort of keep it within the boundaries, right? Correct, Your Honor. And that's exactly what Judge Roth wrote in Major League Umpires Association when Your Honor said that basically you get what you bargained for. When, like these parties, you agree to commit disputes instead of litigation to an arbitrator and your collective bargaining agreement, as this one says, makes the decision of the neutral arbitrator the final and binding award, then, and I quote, Your Honor, the possibility of receiving inconsistent or incorrect rulings without meaningful appellate review of the merits is one of the risks such parties must accept when they choose arbitration over litigation. And that's this case. That's this case. The parties... We've gone well beyond your time, but we're going to hear you on rebuttal, and I'm going to prompt you to think about the punitive question because we didn't even scratch on that. But, you know, one of the questions at least that I have here is that, you know, is this a punitive award? So that's something I'd like to ask you about when we get you back. Thanks for the heads up, Your Honor. All right. Thank you. Let's hear from Mr. Fader now. Thank you, Your Honor. And yes, I will try to address both of those issues. With the court's permission, I'd like to start with the functus officio just because I am, you know, a bit taken aback, I guess, at the argument, which now appears to be that we, by going back for the remedy hearing, consented to reconsideration of the merits award. I don't think there's any support for that anywhere in the... Well, I don't hear Ms. Lassen to say that the... I hear her to argue that the merits award is a natural extension of the... Excuse me, the remedy award is a natural extension of the merits award. It may be inartful. It may be a little sloppy in spots, but it's the natural extension. And so... I will address that, I guess, and I'll be happy to have the court clarify that or she can clarify it herself on rebuttal. It sounded different. It sounded like it was an argument that we consented to reopening, but in any event, you know, there's... You consented to a remedial hearing. I mean, it was clear that when you left, when you left the merits award, it was clear the parties, I think, wisely were sent on their way to try to negotiate a settlement. It didn't happen and everybody knew if that didn't happen, you're going back to see what the remedy was going to be, right? Correct. And right. And so let me move to the part about why it isn't possible to now construe what the arbitrator did on remedy as merely clarifying as opposed to completely changing the merits award on the issue of customer self-installation. The, you know, there obviously, we have this in our brief and I won't spend a tremendous amount of time, but just to point to the specific pages in the record, A249, this is in the merits award. Prior words have confirmed that self-installation by a customer does not amount to contracting out bargaining unit work. And then, I mean, the whole premise of the court's, excuse me, the arbitrator's reasoning and merits award was to separate delivery and say, yes, installation is established that that is something that the company can have the customer do, but delivery is different from that. This is also on A249. The question of customer self-installation of certain equipment, including modular telephones, et cetera, has long been settled. Delivery is another matter. And, you know, it then goes on to the actual order of release and the cease and desist on 252. Again, right at the top, the panel says the customer is not a contractor. And therefore, and that's why installation is okay. But the employees of other companies like UPS are contractors effectively. I'm quoting again now, therefore, the company must cease and desist from mailing the product to customers when the company is to provide the installation or maintenance. Excuse me. What about the language quoted by Ms. Lassen at page A247? Right. So, this actually is right in line with that. It's the, she's basically, I guess I would say turning it on its head. If you look at 247, but with that, the language that she quoted says the bargaining unit members were assigned to deliver the set-top boxes that they installed. That was not saying that installation therefore had to be a bargaining unit job. And that if a customer did it, it was like giving it to a contractor. That was saying, the emphasis is on the opposite, on the other part of it, that when they were installing boxes, they did the deliver, right? This is to establish that delivery, that there's an established practice of delivery being for the bargaining unit. And again, to the extent you have any question about that, you keep reading, you have the parts that I mentioned. And then finally, very end on A253, where the panel spells it out, the bargaining employees who've been denied the opportunity to perform the delivery work in question are entitled to compensation. The company is directed immediately to cease and desist from delivery of set-top boxes. So, the panel makes it clear really multiple times that ruling is limited to the delivery, that self-installation by customers is permissible because customers are not contractors, so that's not assigning work. And I guess the last thing I'd point to on that having been finally determined, it's worth noting that before the remedy hearing, there was an initial attempt to challenge the merits award in district court. The district judge there, and this is at 216 FSEP 3rd at 534, expressly said that here the award is final as to liability but left open the issue of remit. So, this is not something where the liability was left open. The argument has also been made here that the arbitrator should be permitted in the remedy award to go back and explain that what sounded like a final award or final ruling on the merits really wasn't final or I meant something different, but that is inconsistent with the way this circuit has applied functus officio and it's for good reason. And in fact, the court has warned against opening a Pandora's box is the phrase the court used in, this is the colonial pen case, 943 FSEP at 332, that basically if you're going to be able to have the arbitrator effectively change the effect of the initial ruling on the merits by later on saying I meant something different, you lose the whole purpose of the doctrine. And if you look at the way this court has phrased the doctrine itself, it contemplates that, Ms. Lassner referred to slicing and dicing and not splitting up an arbitral award, but the doctrine contemplates that you're going to have part that can be final and part that's left open like you have here. There are the three exceptions to the doctrine. I'm looking now at the Teamsters versus Matlock case, but it comes up in all the cases. So, the second exception there is that, you know, when the arbitrator has left open an issue where the award does not adjudicate an issue which has been submitted, then as to such issue, the arbitrator is not exhausted his function and remains open to him for subsequent determination. But, you know, by clear implication as to the issues that were not left open, those can't then be changed after the fact without running afoul. Well, what about the legal leeway that we're supposed to give to labor decisions? Well, Your Honor, that is all correct. And that is true in terms of like a challenge to the merits award as being in manifest disregard or as, you know, for any attack on the reasoning that certainly there is broad deference to the arbitrators. But the whole premise of the functus officio doctrine is that once something is decided, we don't then provide leeway to the arbitrators later on to say, oh, I meant something different. Unless it was legitimately left open or legitimately made ambiguous in the first instance. But there isn't leeway to go back and change, you know, that is the whole premise of the doctrine. In what way do you think the district court was appropriately deferential to the arbitrator and yet came out to a different conclusion? Sure. So the district court was, I think, quite careful in going through all the various grounds that were argued and did defer to the arbitrators on manifest disregard, on the latches argument. And then there was one additional aspect as to whether, you know, the first the merits award more naturally reads as though this work of delivery has to go to the bargaining unit, but not necessarily to this particular type of employee in the bargaining unit. And the district court recognized that, but said that on that issue, given the deference to the arbitrators and the fact that it was not clear, the district court actually did not overturn that. So I think the district court opinion reflects a pretty careful parsing and analysis of which aspects of the district court opinion are within the scope of the arbitral deference and which are subject to these particularly the functus officio and the award of punitive damages. Mr. Feder, let me engage you in the same line of questioning I engaged with last. Here's how I understand what happened here, and correct me if you think I'm saying anything contrary. The board found that the company was outsourcing the delivery of set-top boxes to service tech delivery and installment. Fair? Yes. Okay. So what if the arbitrator here had said, we've got something like a million one or a million three boxes at issue, is that right? I'd have to check the numbers, but it's at least that. It was over a million, right? So, okay, let's just round it. And also it may involve, one thing that's hard for me here, is it may involve overlap into the, this is the issue of the new customers versus the existing customers. But I doubt that'll affect your hypothetical. All right. So what if the board on the remedy side said, okay, the parties couldn't settle. Now I need to figure out what the damages are. And here's what the damages are. There are X number of service technicians at Verizon. They have the capacity to deliver in any given week, Y number of boxes. And they were deprived of the opportunity of delivering a million boxes. If I divide the you could do the math and you could conclude that in order to deliver those million boxes in a timely fashion to keep the customers from going crazy, that every service technician within the sale, within the force would have had to work 10 hours of overtime a week in order to deliver those million boxes. Therefore, the remedy is 10 hours a week per service tech per whatever time horizon at the standard overtime wage. Wouldn't that be well within the board's power to enter an award like that? I think at least given what the evidence was here and what the board found, I think the answer is no. But you twisted it by saying what the board found. Yeah. I'm questioning what the board found because what the board found here was in a sense, the board did you a favor because instead of giving the union the overtime rate, they gave them the straight rate and they had advocated for the overtime rate. But what I'm concerned about here is the apparent illogic of the board simultaneously concluding that there was, quote, no lost income and then purporting to enter a compensatory damages award on the heels of no lost income. But my hypothetical presupposes that the board found or could have found that they didn't lose any income on their hourly weekly wage, but what they did lose was 10 hours a week of overtime per tech. And couldn't the board have found that as damages on the heels of this merits award as drafted? So as your honor pointed out earlier, though, it doesn't actually follow that there would have been overtime because there are two other things that could well have happened. And I'm not going to speculate and say probably would have happened, but faced with more work to do, you, the company, either could fill orders somewhat more slowly or hire additional people for the position. There... All right. So why don't we remand it then? If we agree with you that the use of the word deter smacks of punitive damages, if we agree with you that there's nothing compensatory about giving millions and millions of dollars to people who lost no income, why wouldn't it be on the table for us to send it back and say, you know, look, Judge Roof was correct here in criticizing the compensatory nature of the award. She was correct on the punitive part of it, but what didn't happen was there wasn't a fair fight in front of the board about whether or not there were overtime damages here. I guess what I would say about that is I understand the concept. I think that, you know, obviously the, you know, what the district court did was simply vacate the award to then go back to the board. I think that if we were to go back to the board, you know, it would be important that, in fact, the union did not actually put on evidence at the remedy hearing to attempt to demonstrate that, in fact, it would have been dealt with by having people work all this overtime rather than in the other alternative ways. And so, you know... Well, now you've just deprived them the opportunity to litigate on remand though. I mean, the point of the remand would be for the parties to focus on the counterfactual of what would have... Had the company not breached the contract, what would have happened? Right. Well, sure. And all I'm saying is that I think that that exact issue was there for the they certainly could, I guess, attempt to argue that, in fact, it hadn't been open to them or that, you know, and that the board hadn't actually found that they didn't lose overtime income. That's not going to be something that this court is going to address one way or the other, obviously. But, I mean, I think, you know, I'm just trying to be candid. I think that if I were back before the board, I would be pointing out they could have proved this and didn't. And, you know, and we think the board found that, but that's not any part of, I think, what this court is being asked to, you know, simply affirm the, you know, vacator of the remedy award, which the district court then sent back to the board and what wouldn't be open. Well, that raises a practical question. I have no idea what the answer is. Maybe you and your colleague can help me. If we just straight affirm, what's the next step on this case? Is this case dead or are there still proceedings to follow on it in front of a new board or some other labor panel? Well, I mean, look, I would hope that, you know, as in all would, you know, with it now at least clarified that installation is not part of it and that only compensatory and punitive, not punitive rewards are permissible, that would enable the parties to actually, you know, resolve it without themselves, without having to go back before the board. But, obviously, if they couldn't, I think the way the district court frames it is that it's vacated, you know, for the board to now enter a proper remedy. So, you know, it's not, at least in that sense, it's not, it's not bad. I have one last, at least for me, one last question. Going back to the notion of whether or not there was an opening for the arbitrator to revisit the scope of the merits decision. And the question I have is, as I understand, there were three avenues for, that were at issue initially. And then you, and Verizon created a fourth option with this new category of unionized assistant, assistant technicians, like a deputy assistant or whatever. And they were going to deliver boxes to the customers who then very cleverly got to do the installation themselves. Does not the fact that this new option was created by Verizon after the merits decision was rendered implicitly invite the board or the arbitrator to revisit the Certainly not as to the basic, because look, this new position was created to satisfy what the board had said, which was that we had to have bargaining unit employees deliver the boxes. Nothing about creating that position suggests any ambiguity about, any invitation to reopen the basic premise of the decision that the actual installation by customers is fine. So, you know, I think the answer to that, from our standpoint is no. When your bargaining unit worker delivers the box, isn't the customer entitled to have that worker actually install it too? I mean, the customer may have the power to say, look, I don't need any more thanks. You can go home. I can do this myself. But isn't the customer entitled to have that bargaining unit worker actually install the box as well? Entitled to? I mean, I'm not sure I can speak to that. It's not really in the record here. I think that, practically speaking, the answer is probably going to be no. But, you know, if you're making an appointment for someone to just, if you just have to have somebody drop off a box, that's very different from having to make an appointment to have a skilled technician come, have the time to do an installation. You know, you're going to get your six hour window to wait at home for them, whatever it is. You're saying there were two options. There were really three options. Option one is I can drive to the local Verizon store, pick up the box, bring it home and install it. Option two is I can have the Verizon tech deliver it to my house and meet them at, have them drop it on the stoop and say thank you very much. And option three is I can invite them into my house because I don't know what I'm doing and they can set it up for me. Yeah. Although I think that, you know, and now, I mean, I just want to be very clear that I'm not talking about something that is in the record, but just, you know, I know that when I've set up cable appointments, if you want them to install it, they have schedules that they've got to meet. And so if you want to add to the work, you can't necessarily just say, I need you to stick around for two hours to install it. Okay. All right. Any other questions for Mr. Fader? No. Thank you. All right. Thank you, Mr. Fader. Ms. Lassen, you can rebut in any way you see fit, but I'll just ask that you do address, again, my second concern with this order is when I see the word, my first concern is that a fining of no income and then an award of a lot of money for compensatory damages. My second concern is when the adjudicator says that I'm entering this word to, quote, deter bad behavior. That certainly looks a lot like punitive damages to me. You have to unmute, Ms. Lassen. Okay. Thank you, Your Honor. Very briefly, before I address that issue, I'd like to respond to Mr. Fader's functus officio comments. I believe this is a case where the elephant in the room, so to speak, from the court's perspective is the deference that it will accord to the award. Mr. Fader's offered a bunch of different scenarios. The board referred to the customer as contractor. The board referred to prior awards, finding that customers could self-install. But this panel, this board, held that that's not the issue in this case. This board explained the intent of our award was to define the work assignment that was protected by Article 17.01. This board had the right, for the reasons that Judge Hardiman articulated, to complete its mission, so to speak, the issue that was submitted to it in the original, by the parties at the inception of the case. What is the remedy for the violation of Article 17.01? The Verizon has admitted now that it violated Article 17.01. And when it appeared before the board in the remedy phase of the hearings, the issue was not did the company violate 17.01, but what shall be done about it? And in doing that, number one, the board was not functus officio because it was still functioning in its original jurisdiction. Number two, the exceptions two and three in Colonial Penn clearly apply in this case. Number two, there was an issue that was submitted to the board but not yet decided, the remedy. Number three, there was, by any measure, and I think everyone on this call being candid would agree, there was an ambiguity between that the parties perceived in the board's merits decision. The ambiguity being that issue of installation. So who do we listen to when there's an ambiguity? Do we listen to CWA's construction? Do we listen to Verizon's construction? No. We listen to the arbitrator's interpretation and construction of her own intent. As Judge Sloviter cautioned in Brownsville General Hospital... Sloviter, not Sloviter. Sloviter. Thank you, Your Honor. The court should not have to divine the intent of the arbitrator. That's a perilous endeavor. In the arena of labor arbitration, it's particularly appropriate that the arbitrator, rather than the courts, determine the award's meaning. I could go on. I know we have a list of this argument, but I think that's enough. I agree with everything you just said, but I don't... I'm taking the arbitrators at face value, what they said. And not only what they said, because I'm with you, because of the latitude we give in these types of cases, I'm with you about the stray word or the this or that. That's what I meant about really reviewing this in a hyper-technical way. We don't do that. But the fact remains that taking them at their word, there was a finding of no lost income and purportedly, on the heels of that finding of no lost income, a very large compensatory award. And also they said the purpose is to deter. And why is that not punitive? It's just a matter of punitive damages. So I think that the board's award is not problematic for two reasons. First, because when it made the statement, the grievance did not lose income because they were fully employed. You have to put that statement in the context of both the record and the award itself. In the context of the award itself, it's very clear at A268 that the board was considering, should we award compensatory damages at a regular time rate, a straight time rate, or at an overtime rate? And the board was obviously, it appears, not impressed with the union's argument. And it was not impressed with the union's argument because the services technicians didn't lose their income from full employment. And that has its grounding in the evidence before the board, your honor. In the record evidence, there was extensive testimony. I've referenced it before from Mr. Reamer, from Mr. Mooney, that services technicians get a base 40-hour rate and that the contract provides overtime after 40 hours. The board was obviously impressed that the services technicians in this case were not laid off. The services technicians in this case were not part-time. The services technicians... The problem here is, maybe I'm reading through the lines incorrectly, the problem here is when they outsourced all these deliveries to third-party carriers, they were kind of like working them out of a job eventually, right? They're kind of dying on the vine. Isn't that part of the problem here? They don't have that much work to do. Or maybe they did have enough work to do. It's just that there were so many boxes to deliver that there's enough to go around for the bargaining unit people and the third-party shippers. Actually, like Mr. Fetter, I'm somewhat going outside the record here, but the services technicians are very highly skilled, very busy employees who do a variety of service work on the massive infrastructure and installations that Verizon has across its footprint. So then the case really does sort of sound like it's all about the installation because what I don't want, if I'm running a business, is people with that skill level being delivery men and women, right? I want them doing the heavy lifting, not around dropping stuff off. That may be true, Your Honor, but again, this goes back to what was the protected work assignment? The work assignment in this case found by the board is that whether Verizon could have done it a different way, whether Verizon could in the future after negotiating with the union yet do it a different way, the protected work assignment in this case is that services technicians deliver and install set-top boxes to, quote, existing customers, the customers who wanted a new box. And it's not punitive for the board. Does that mean a customer wanted a new box couldn't just say, hey, just drop it off? I'm going to be at work all day. I'll install it myself. They weren't allowed to do that or the existing customers weren't allowed? They were not allowed to do that, Your Honor, so if you wanted to do your own, you had to go pick it up. You had to go pick it up. Yes. As the board found in the remedy award or stated in the remedy award, as Verizon concedes at page seven of its brief, there was only option one and option two at the time this dispute arose. Option one, the service technician delivers the box and installs it. Option two, the customer goes and picks up the box at a Verizon presence center and then installs it herself. The reason that all the customers, not a contractor comments appeared in the award, in my view, is because as Mr. Reamer testified, a customer is a customer, not a contractor. If a customer goes and gets the box, that doesn't implicate the work assignment, the protected work assignment. If a contractor delivers the box, then it implicates the protected work assignment. And the board repeatedly said, repeatedly said during the hearing and the transcript and in its final award, Verizon's focus on customer self-installation is misplaced. Why? Because the protected work assignment that it found included delivery and installation by the services technicians. Let me ask you a question. Does the collective bargaining agreement prohibit punitive damages? It does not, Your Honor. Does it permit? It doesn't speak to it. And in the 17.01 prior awards submitted by the parties, many of the arbitrators awarded time and a half damages because they deemed Verizon's conduct to be flagrant or to be particularly contrary to prior awards. So, there is some suggestion in the record in this case that in Article 17.01 cases, arbitrators are all over the map whether to award compensation for lost work opportunities at straight rates or at overtime rates. This is a good report. We ask on remand that there be clarification as to punitive damages, whether they're permitted or not under the collective bargaining agreement. Well, I don't know that this, that issue would be before this board. I certainly think the board would be able to clarify whether it viewed the damages it assessed as punitive. In particular, whether when it used the word, the grievance, the phrase, the grievance did not lose income, whether that was a, whether that went to the board's decision to, about the rate for compensation or whether it was intended in the assessment of damages to, to be punitive. I don't believe it was. When you look at the context of the record and the specific paragraph in which that sentence occurs, it's followed by the statement, the record does not support a finding that the remedy should be at overtime rates, but it should be calculated at top straight time rate. So Judge Hardiman, my, to summarize that issue of the, the, the grievance did not lose income sentence, I believe that, I don't believe that the record or the board's own statement in that paragraph would support an inference that there were no lost work opportunities that should be compensated because at numerous other locations in the awards, A-253, A-269, A-268, the board repeatedly says that, that they, they lost work opportunities, that they were deprived of work opportunities, and that a monetary award is a record. That, you've brought us full circle to where I started with you, which is this strange thing. They certainly lost work, work. They lost a million boxes of work, but if they made the same amount of money for delivering a million dollar, a million fewer boxes, were they damaged in any way? And, you know, I don't know. It depends, I guess it depends on the person. Some people, if you're a hardworking person and you like to be busy all day, you were damaged because you weren't kept busy enough. And if you were someone who liked to get through the day doing as little as possible, then you hit the lottery, I suppose. But let me ask one other, one other question. I don't know about the lottery when it comes to doing more work, your honor, but. No, no, no, that's, no. I can only say that. The people that did, the people that didn't want to have to work, who didn't have to deliver the million boxes, they hit the lottery, but. The testimony in the record, your honor, from Mr. Mooney was that the work would have been done in overtime as additional work of the services technicians. Which is, which is again. For which they could be paid. Which I'm scratching my head why the board didn't award overtime. Which brings me to my final question. Do you agree with Mr. Fader that if we straight affirm what the district court did here, that you're still alive with the arbitrators in some way, shape, or form? Or do you think the case is dead at that point? This particular dispute is, I'm not sure it'll ever die, your honor. Well, it's good for the lawyers anyway, right? It's not good for lawyers because some lawyers see that their career may not last another 20 years. But the, you know, 17.01 has been in existence since 1943. These, this is a critical dispute to both of the parties here, I think. Because the board had a hard task before it. It had to take a work preservation agreement that landed at D-Day and apply it to decidedly 21st century facts. So the issue of whether it will go on is my premise, is my surmise, that it will go on. And I surmise that this board thought that Let me show you my cards. The reason I asked the question is because I'm also wondering whether, even if we were to agree generally with the district court, that the board exceeded its very wide berth in some of the things it did in the remedial award. It raises the question of whether there should be some instructions to the arbitrators to do it over and to pay, you know, careful attention to this question. If we were to say that what the board did was punitive and or an invalid compensatory award because of the mismatch between no lost income and damages, that still might leave open the question of whether some other remedial award might be appropriate, namely the award of properly calculated lost overtime that the bargaining unit members missed because of the end run around them by using the third party shippers. That's what I'm seeking your guidance on. If the court remands, and the court directs the board to recalculate, take additional evidence, and recalculate the damages so that they are compensatory and not otherwise contrary to the court's order, obviously that's what the parties would do. The board would reconvene, and it would take that evidence. I've been in that situation before. It could certainly do so, and arguably on most of these issues, if the district court found that the damages were not properly calculated, it should have remanded just for that reason. But in this particular case, I do submit that it's not right to infer that the, correct to infer that the board intended these damages. There's enough dicta and enough findings in their awards to conclude that the damages, the wage damages were compensatory. And as your honor knows, simply because the board used the word deter, that would not in itself convert those compensatory damages to punitive damages, because compensatory damages can also be punitive. Verizon says we're being punished because the court, the board said it also wanted to deter future violations, but Verizon admits that it violated article 17.01. And it's not being which was violate article 17.01. And there's no, there's no entity that can properly resolve that other than the one that the parties bargained for and agreed to, which is the arbitration board. All right. Do Judge Roth or Judge Prater have anything further? Nothing further. All right. Well, I want to apologize on behalf of the panel for putting both of you on the grill for so long, but as you can tell, this is a very difficult, complicated case. And I will also add that quite often the length of time to which the panel puts the lawyers on the griddle is a, is a sort of backhanded compliment to the helpfulness of counsel to the panel. So the court is grateful for your helpful argument and we will take the matter under advisement. Yeah, let me add, I thought both arguments were very helpful, very well done. Absolutely. Thank you, Your Honor. Be safe. Thank you.